*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ANITA HENDRICKS-PEARCE, as | ) | |
| Personal Representative of the | ) | |
| Estate of DEWELL W. PEARCE, | ) | |
| | ) | Supreme Court No. S-14820 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-08-09147 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF CORRECTIONS, | ) | No. 6899 - April 25, 2014 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Ted Stepovich, Law Office of Ted Stepovich, Anchorage, for Appellant. Dale W. House, Senior Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Stowers, Justice, not participating]

BOLGER, Justice.
FABE, Chief Justice, with whom MAASSEN, Justice, joins, dissenting.

I.    INTRODUCTION

A prisoner recovered a medical malpractice judgment against the State of Alaska Department of Corrections. But when DOC paid the judgment, it deducted the

expenses it had incurred for unrelated medical care provided to the prisoner by outside providers. DOC then brought an action seeking a declaratory judgment that DOC had the statutory right to reimbursement from the prisoner for medical expenses incurred on his behalf. In this appeal, the prisoner's estate argues that only prisoners with access to the specified funding sources listed in the statute are liable for the cost of outside medical care. But we conclude that the statute entitles DOC to reimbursement from a prisoner regardless of whether the medical care is provided inside the prison or made available through an outside provider. We also conclude that the common fund doctrine does not require DOC to share the cost of the prisoner's attorney's fees for the medical malpractice action.

## II.   FACTS AND PROCEEDINGS

### A.   Legal Framework

The State has a statutory and constitutional obligation to provide necessary medical care to all prisoners regardless of their ability to pay.[1] Although the State provides medical care through DOC employees and contractors (in-house medical care), some medical conditions require treatment by outside providers (outside medical care).[2] Alaska Statute 33.30.028 sets out the prisoner's responsibility for medical expenses incurred during incarceration.[3] DOC has also adopted a regulation, 22 AAC 05.121, that

---

[1]    AS 33.30.011(4)(A); *State, Dep't of Corr. v. Hendricks-Pearce*, 254 P.3d 1088, 1089 (Alaska 2011) (citing AS 33.30.011(4)(A); *Abraham v. State*, 585 P.2d 526, 531 (Alaska 1978); *Rust v. State*, 582 P.2d 134, 143 (Alaska 1978)).

[2]    *Hendricks-Pearce*, 254 P.3d at 1089-90 (citing 22 Alaska Administrative Code (AAC) 05.121(b) (2004)).

[3]    AS 33.30.028 provides, in relevant part:

>      (a) Notwithstanding any other provision of law, the

(continued...)

outlines the prisoner's responsibility for payment for these services, with particular focus on the co-payment system.

### B. Prior Litigation And First Appeal

Most of the underlying facts of this case have already been reviewed by this court in *State, Department of Corrections v. Hendricks-Pearce*.[4] Dewell Pearce was a

---

[3] (...continued)
liability for payment of the costs of medical . . . care provided or made available to a prisoner committed to the custody of the commissioner is, subject to (b) of this section, the responsibility of the prisoner and the

(1) prisoner's insurer if the prisoner is insured . . . ;

(2) Department of Health and Social Services if the prisoner is eligible for assistance . . . ;

(3) United States Department of Veterans Affairs if the prisoner is eligible for veterans' [medical] benefits . . . ;

(4) United States Public Health Service, the Indian Health Service, or any affiliated group or agency if the prisoner is [eligible]; and

(5) parent or guardian of the prisoner if the prisoner is under the age of 18.

(b) The commissioner shall require prisoners who are without resources under (a) of this section to pay the costs of medical . . . care provided to them by the department. At a minimum, the prisoner shall be required to pay a portion of the costs based upon the prisoner's ability to pay.

[4] 254 P.3d 1088.

prisoner from 1994 to 2008.[5] During his incarceration the State provided Pearce medical care for several conditions;[6] the State paid $147,494.94 to outside medical providers. While in custody, Pearce sued the State for medical malpractice and was awarded a $369,277.88 judgment against the State in 2008.[7] The State paid part of the judgment in May 2008, but withheld $140,847 as reimbursement for medical expenses that were unrelated to the injuries giving rise to the malpractice suit.[8] In July 2008 the State filed an action for declaratory relief regarding its right to reimbursement.

The parties disputed whether the State was entitled to reimbursement from Pearce.[9] Because Pearce had been released before the State filed its declaratory judgment action, the parties disagreed on whether AS 33.30.028 applied to former prisoners after their release from custody.[10] The superior court determined that AS 33.30.028 did not apply to former prisoners.[11] It therefore dismissed the State's suit and ordered the State to pay Pearce $140,847 (the amount the State had withheld from the original medical malpractice judgment) plus interest.

---

[5]     *Id.* at 1090.   "Dewell Pearce died in November 2009 and Anita Hendricks–Pearce, his estate's personal representative, was substituted in his place." *Id.* at 1090 n.3.  For ease of reference we use "Pearce" throughout this opinion to refer to both the prisoner and his estate.

[6]     *Id.*

[7]     *Id.*

[8]     *Id.*

[9]     *Id.*

[10]     *Id.*

[11]     *Id.* at 1091.

On appeal, this court reversed the superior court's ruling.[12] We stated that "[t]he primary goal of AS 33.30.028 is reducing medical costs"[13] and observed that "preventing the State from collecting from prisoners to the fullest extent possible would contravene the statute's cost-saving purpose."[14] We therefore held that for the purposes of AS 33.30.028 the term "prisoner" includes former prisoners.[15]

This court remanded two separate issues — then not yet ruled upon — to the superior court: (1) whether AS 33.30.028 entitles the State to reimbursement for the cost of outside medical care from a prisoner without the funding sources identified in AS 33.30.028(a);[16] and (2) whether the State's recovery, if allowed, was subject to a claim for attorney's fees and costs under the common fund doctrine.[17]

### C. Remand And Subsequent Appeal

#### 1. The parties' arguments

On remand, both parties moved for summary judgment. Each offered a distinctly different interpretation of AS 33.30.028. Pearce argued that the statute allows reimbursement for the cost of outside medical care only from the specified funding sources identified in subsection .028(a). Pearce's reading of the statute rested on two distinctions: the first distinction related to the type of medical care at issue (whether it

---

[12]     *Id.* at 1093.

[13]     *Id.* at 1092.

[14]     *Id.* at 1093.

[15]     *Id.*

[16]     *Id.* at 1093-95.

[17]     *Id.* at 1095 n.25.

was in-house or outside), and the second distinction compared prisoners with access to the specified funding sources listed in subsection .028(a) to those without.

Pearce argued that the statute distinguishes between two types of medical care — care "provided" by DOC (in-house medical care) and care "made available" by DOC (outside medical care) — and that under subsection .028(b), prisoners who lacked the .028(a)-specified funding sources are required to pay only for care "provided to them by the department." Pearce therefore concluded that only prisoners with access to those specified funding sources were liable for the cost of outside medical care "made available" to them. Pearce contended that his reading of the statute was supported by the DOC regulation concerning prisoner co-payments. Pearce also argued that his attorney's fees should be deductible from any recovery made by the State under the common fund doctrine.

The State argued that liability for the cost of outside medical care is imposed on *all* prisoners under AS 33.30.028, regardless of access to the .028(a)-specified funding sources, and that the legislative history does not support a distinction between medical care "provided" and care "made available." It contended that the statute itself made no distinction between in-house and outside medical care and that the regulation cited by Pearce was irrelevant to the statutory interpretation question because that regulation concerned co-payments rather than reimbursement.[18] Finally, the State argued that any recovery it made was not subject to a pro rata reduction for attorney's fees.

---

[18]    *See* 22 AAC 05.121(b) (providing that prisoners are financially liable for a co-payment for in-house medical care).

## 2. The superior court's analysis

The superior court ruled in favor of DOC on both issues. It determined that AS 33.30.028 entitled DOC to reimbursement for the costs of outside medical care from prisoners like Pearce who lacked the specified funding sources identified in subsection .028(a). It determined that subsection .028(a) identified two categories of medical care — that "provided" and that "made available" to the prisoner. But the court concluded that subsection .028(a) assigned financial liability for *both* categories of care to the prisoner. The court determined that the distinction between care "provided" and care "made available" is relevant only in subsection .028(b), which requires some level of payment for care only when the care is "provided to [the prisoner] by the department."[19]

Turning to the legislative history of the statute, the court found that subsection .028(b) was intended to deter prisoners' frivolous use of medical care, rather than to limit a prisoner's liability under subsection .028(a). The court also found that the legislative record reflected the legislature's intent to grant the State the ability to recover the full cost of medical care "if at some point in the present or future the prisoner had sufficient funds."

The superior court also ruled that the common fund doctrine was not applicable because Pearce and his attorney did not confer a benefit upon the State through the medical malpractice lawsuit. It therefore concluded that DOC's recovery was not subject to a pro rata reduction for attorney's fees and awarded judgment against

---

[19] AS 33.30.028(b).

Pearce's estate in the amount of $149,730.95, including attorney's fees.[20] Pearce appeals both rulings.

## III.   STANDARD OF REVIEW

This case primarily involves a matter of statutory interpretation. Statutory interpretation is a question of law to which we apply our independent judgment.[21] However,"an agency's interpretation of a law within its area of jurisdiction can help resolve lingering ambiguity, particularly when the agency's interpretation is longstanding."[22]   Whether the common fund doctrine applies to this case is also a question of law that we review independently.[23]

## IV.   DISCUSSION

### A.   A Prisoner Is Liable For The Costs Of Medical Care Provided Or Made Available.

As noted above, under AS 33.30.028(a) "the liability for payment of the costs of medical . . . care *provided or made available* to a prisoner . . . is, subject to (b) of this section, the responsibility of the prisoner . . . ." (Emphasis added.)  The following subsection, AS 33.30.028(b), states that "[t]he commissioner shall require prisoners who

---

[20]   The superior court's order awards DOC a principal amount of $137,010.35 plus $12,720.60 in attorney's fees for a total of $149,730.95.  The record does not indicate how the superior court arrived at the figure of $137,010.35; the State claimed to have spent $147,494.94 on outside medical care for Pearce and withheld $140,847.00 from the final judgment award in the 2008 medical malpractice case.  Neither party has appealed the amount of the award.

[21]   *Native Vill. of Tununak v. State, Dep't of Health & Soc. Servs.*, 303 P.3d 431, 440 (Alaska 2013).

[22]   *Bartley v. State, Dep't of Admin., Teacher's Ret. Bd.*, 110 P.3d 1254, 1261 (Alaska 2005) (citing *Union Oil Co. v. State, Dep't of Revenue*, 560 P.2d 21, 23, 25 (Alaska 1977)).

[23]   *See Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 756 (Alaska 1996).

are without resources under (a) . . . to pay the costs of medical . . . care provided to them by the department. At a minimum, the prisoner shall be required to pay a portion of the costs based upon the prisoner's ability to pay."

When we interpret this statutory language we begin with the plain meaning of the statutory text.[24] The legislative history of a statute can sometimes suggest a different meaning, but "the plainer the language of the statute, the more convincing contrary legislative history must be."[25] "Even if legislative history is 'somewhat contrary' to the plain meaning of a statute, plain meaning still controls."[26]

Pearce argues that under subsection (a), in-house services are "provided" to a prisoner and outside medical services are "made available" to a prisoner. Pearce argues that subsection (b) means that a prisoner who has no insurance or other special resources under (a) is only required to pay a co-pay for in-house services and is not required to pay anything for outside medical services. In response, the State argues that all medical services are both "provided" and "made available" to a prisoner who receives medical care. The superior court concluded that this distinction makes no difference in this case because subsection (a) makes a prisoner liable for the costs of all medical care.

We conclude that the superior court's interpretation of this statute is most consistent with its plain meaning. The language of subsection (a) makes a prisoner liable for all medical care regardless of whether it is "provided" or "made available" to the prisoner. Subsection (b) requires minimum payment terms: the commissioner, at a minimum, must require prisoners without adequate resources to make a co-payment for

---

[24] *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012).

[25] *Id.* (internal quotation marks omitted).

[26] *Estate of Kim ex rel. Alexander v. Coxe*, 295 P.3d 380, 387 (Alaska 2013) (citing *Oels v. Anchorage Police Dep't Emps. Ass'n*, 279 P.3d 589, 597 (Alaska 2012)).

services "provided" to them. But this subsection does not set a maximum payment for services "provided," nor does it set any limitations on liability for services "made available" to the prisoner.

The dissent argues that our reading of the statute renders superfluous the statutory clause making subsection (a) "subject to" subsection (b). However, under our interpretation, subsection (a) reflects a reasonable presumption that there will be dual liability for the prisoner and the listed collateral payers, which is made subject to subsection (b): if there are no collateral payers, and the prisoner is otherwise unable to pay in full, the commissioner must collect at least a minimum payment from the prisoner for all in-house services. Even if our reading of the statute did render the "subject to" clause redundant, such an interpretation is closer to the text than the substantial negative implication proposed by the dissenting opinion: namely, that the legislature's silence regarding the situation in which a prisoner has no collateral resources warrants the addition to subsection (b) of a provision relieving the prisoner of all responsibility to pay for outside services even if the prisoner has adequate personal resources to pay for those services.

In the same vein, the dissent argues that our reading of the statute renders the list of collateral payers in subsection (a) redundant because if the prisoner is responsible for all of his medical costs, then listing potential collateral sources for payment is unnecessary. However, the enumeration of possible collateral sources serves at least three purposes: (1) it gives notice to potential collateral payers that they may be liable for medical costs if they are associated with a prisoner as described in the statute; (2) it provides prisoners with guidance about their payment and coverage options; and (3) it provides the DOC with a list of alternative payers to collect from. These are reasonable purposes that give meaning to this statutory language.

To satisfy the requirements of AS 33.30.028(b), DOC adopted the regulation found at 22 AAC 05.121. Subsection (b)(1) of this regulation requires a prisoner to make a co-payment for medical services provided to the prisoner by the department through department employees or contractors. Subsection (b)(2) requires a prisoner to arrange to obtain payment or coverage from one or more of the responsible parties set out in AS 33.30.028(a) for services not provided through department employees or contractors.

This portion of the regulation supports the distinction between in-house services and outside services that Pearce relies on. But the regulation does not conflict with our reading of the statute. Subsection (b) of the statute mandates that the commissioner charge prisoners at least a minimal amount for in-house services rendered. The regulation implements that command and properly goes no further. Like the statute, the regulation says nothing of divesting the prisoner lacking collateral resources of liability for outside services if the prisoner has adequate personal resources to pay for those services.[27] Indeed, the regulation makes no provision at all for the situation in which a prisoner without collateral resources has received outside services, which is appropriate in light of the statute's silence on the issue.

One could argue that our reading of dual liability would render portions of the regulation incomplete or redundant. For example, 22 AAC 05.121(e) states that "a prisoner may be charged for the full costs of health care services [provided by outside providers], resulting from a self-inflicted injury, or an injury to the prisoner or to another prisoner resulting from an assault or other violation of facility rules or state law . . . ."

_____

[27]    In contrast, the regulation does state a different situation in which the department will not pursue payment: where certain inspections, examinations, or testing are required by other state regulations or are necessary to protect the health of others. *See* 22 AAC 05.121(c).

This subsection seems unnecessary if AS 33.30.028(a) makes the prisoner liable for all medical care. But we read this subsection as a clarification that the department may collect full payment from a prisoner who inflicts an injury without regard to the minimum co-payment that would otherwise apply. Interpreted in this fashion, the regulation does not conflict with the our reading of AS 33.30.028(a).

The superior court's interpretation of this statute is also consistent with its legislative history. We have already recognized that the primary purpose of this statute is to reduce medical costs:

> The primary goal of AS 33.30.028 is reducing medical costs: the legislation that led to the reimbursement statute's enactment was directed at controlling the costs incurred in correctional institutions, and the sponsor statement indicated the proposed measures would reduce some of the costs of inmate health care and allow [the State] to focus its limited budget on its true mission. Although the legislative history does not explicitly address extending liability to former prisoners, preventing the State from collecting from prisoners to the fullest extent possible would contravene the statute's cost-saving purpose and is not justified by another interest evident from the face of the statute or its legislative history.[28]

In this case, the superior court's decision to include a prisoner's personal wealth among those resources subject to reimbursement is consistent with the statute's primary purpose of reducing the DOC's medical costs.

Moreover, the legislative record reflects an intent to take advantage of any financial resources to which a prisoner might have access. In a hearing before the House Finance Committee, a member of Representative Mulder's staff noted that "there will be individuals . . . that will have other coverage *or resources*" and that "[t]he legislation

---

[28]    *Hendricks-Pearce*, 254 P.3d at 1092-93 (internal citations and quotations omitted).

allows the Department to become a secondary payer to the primary health care provider."[29]  The staffer also stated that "the intent is to allow the Department to take advantage of other coverage that is available *or to access the resources of someone that is independently wealthy*."[30]  These statements suggest that the committee intended that a prisoner's personal wealth be included within the coverage of this statute.

The dissent argues that, rather than cost-saving generally, the legislature had a more specific purpose in mind when it drafted the statute:  "to deter frivolous prisoner medical complaints and the overuse of medical services."  And the dissent argues that this more specific goal, while perfectly consistent with an overarching desire to cut costs, "outweighed any subsidiary goal of recovering costs."  Although we do not agree with that view, even if it is taken as true, our reading of the statute is better suited to achieving this deterrence.

Under our reading of this statute, a prisoner will be liable for medical costs, those rendered both in-house and outside the prison, whether or not he has collateral resources.  This rule will certainly deter prisoners from overuse of medical services more than a rule relieving a prisoner of all responsibility.  If Pearce's interpretation were adopted, there would be nothing to deter a prisoner from seeking outside care other than the requirement that he first obtain a referral from an in-house provider.  But, whether or not prior approval is required, a prisoner's liability for the cost of outside treatment will also act as a reasonable deterrent.  This is the same reasonable deterrent that affects

---

[29]  Minutes, House Finance Comm. Hearing on H.B. 219, 19th Leg. 1st Sess. (Apr. 20, 1995) (testimony of Dennis DeWitt, Legislative Assistant to Rep. Eldon Mulder) (emphasis added).

[30]  Minutes, House Finance Comm. Hearing on H.B. 219, 19th Leg. 1st Sess. (Apr. 20, 1995) (testimony of Dennis DeWitt, Legislative Assistant to Rep. Eldon Mulder) (emphasis added).

patients outside a prison; any patient may reasonably choose to decline unnecessary medical services, especially if he has no collateral resources. If this statute was intended to deter unnecessary treatment by holding prisoners financially responsible for their treatment decisions, such deterrence will be mitigated if wealthy prisoners are relieved of their medical expenses.

Thus, there is no reason why wealthy prisoners should be exempted from liability in a bill designed either to deter over-use of medical services or to reduce costs. The dissenting opinion suggests that one possible motivation for such an exemption could be to reduce poverty and recidivism. But there is no indication that the legislature believed that making prisoners responsible for their own bills would promote recidivism. From the legislative history we have reviewed, it seems more likely that the legislature concluded that controlling these medical costs will allow DOC "to focus its limited budget on its true mission,"[31] that is, to maintain correctional facilities, to provide necessary treatment, and to establish programs that are calculated to protect the public and promote rehabilitation.[32]

Medical services in this country are extremely expensive for all patients, both inside and outside prison walls.[33] Making law-abiding Alaskans responsible for their own health care decisions and excusing prisoners from such liability could be

---

[31]     *Hendricks-Pearce*, 254 P.3d at 1092-93.

[32]     *See* AS 33.30.011.

[33]     *See, e.g.*, Dan Mangan, *Medical Bills Are the Biggest Cause of US Bankruptcy*, CNBC Health Care (June 25, 2013, 2:29 PM), http://www.cnbc.com/id/100840148; Jason Kane, *Report: 1 in 3 Americans Burdened With Medical Bills*, The Rundown, PBS NewsHour (March 8, 2010, 10:16 AM), http://www.pbs.org/newshour/rundown/2012/03/report-a-third-of-americans-burdene d-with-medical-bills.html.

considered deeply unfair. Indeed, if the cost of paying for a prisoner's health care is absorbed by DOC, then the public will bear that cost in taxes or foregone opportunities.

In summary, the legislative history is consistent with a natural reading of AS 33.30.028(a), requiring a prisoner to be liable for the cost of all medical services provided or made available to the prisoner. The implementing regulation is not inconsistent with this interpretation. The superior court properly concluded that Pearce was liable for payment of the cost of outside medical care made available to him during his incarceration.

**B.    The Common Fund Doctrine Does Not Apply To The State's Reimbursement Claim**.

Pearce also argues that the superior court should have deducted a pro rata share of the attorney's fees he incurred pursuing the medical malpractice judgment from the funds the State retained to pay for his medical care. The common fund doctrine provides that a litigant or "lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. The doctrine is implicated any time one litigant's success releases well-defined benefits for a limited and identifiable group of others."[34]

The common fund doctrine has been applied to subrogation and class action cases where the plaintiff's attorneys obtained a specific recovery for the benefit of other parties.[35] For example, when an employee recovers on a personal injury or wrongful death claim against a third party, a pro rata share of the employee's attorney's fees and

_____

[34]    *Alaska Native Tribal Health Consortium v. Settlement Funds Held For E.R.*, 84 P.3d 418, 433-34 (Alaska 2004) (internal quotations and citations omitted).

[35]    *Edwards v. Alaska Pulp Corp.*, 920 P.2d 751, 756 (Alaska 1996) (applying common fund analysis to class action case); *Cooper v. Argonaut Ins. Cos.*, 556 P.2d 525, 527 (Alaska 1976) (applying doctrine to workers' compensation reimbursement statute).

costs is deducted from the workers' compensation lien for the same injury.[36] Likewise, when a hospital accrues a medical lien for care provided to an injured patient, the patient's attorney fees must be deducted before the lien is paid from a settlement for those injuries.[37]

But the common fund doctrine should not be extended to general obligations that existed before the plaintiff's injury — obligations that were not dependent on the creation of a settlement fund. In *Alaska Native Tribal Health Consortium v. Settlement Funds*, this Court cited with approval the New Mexico Supreme Court's decision distinguishing indirect beneficiaries, such as utility creditors and mortgage holders, from the hospital that directly benefits from a hospital lien.[38] Other jurisdictions have declined to apply the common fund doctrine to general creditors of a plaintiff simply because the plaintiff's recovery creates a new asset.[39] In these cases, the plaintiff is not acting on behalf of its creditors in pursuing its claim. The creditors' claims are independent of the plaintiff's claim; the debts to the creditors exist regardless of the outcome of the litigation.

In this case, the medical expenses Pearce incurred in prison were unrelated to the injuries he sustained from medical malpractice. The State became Pearce's creditor for his unrelated medical expenses, but the State had no special lien on his malpractice

---

[36]     *Cooper*, 556 P.2d at 525-28.

[37]     *Alaska Native Tribal Health Consortium*, 84 P.3d at 433-34.

[38]     *Id.* at 435 (citing *Martinez v. St. Joseph Healthcare Sys.*, 871 P.2d 1363 (N.M. 1994)).

[39]     *In re Key West Rest. & Lounge, Inc.*, 54 B.R. 978, 985 (Bankr. N.D. Ill. 1985); *Watkins v. GMAC Fin. Servs.*, 785 N.E. 2d 40, 45 (Ill. App. Ct. 2003); *TM Ryan Co. v. 5350 S. Shore, LLC*, 836 N.E.2d 803, 811 (Ill. App. Ct. 2005); *Hilton Oil Transp. v. Oil Transp. Co., S.A.*, 659 So.2d 1141, 1154, n.7 (Fla. Dist. Ct. App. 1995); *Villanueva v. Wolff*, 419 A.2d 1141, 1147 (N.J. Super. Ct. App. Div. 1980); *Leischner v. Alldridge*, 790 P.2d 1234, 1237 (Wash. 1990) (en banc).

recovery. Pearce's attorneys did not create any special fund that benefitted the State, so the common fund doctrine does not apply to this recovery.

**V.    CONCLUSION**

We conclude that AS 33.30.028(a) allows the DOC to seek reimbursement for the costs of outside medical care, and that the common fund doctrine does not apply to this case. We therefore AFFIRM the superior court's judgment.

FABE, Chief Justice, with whom MAASSEN, Justice, joins, dissenting.

In my view, the court's interpretation of AS 33.30.028 is incorrect, and traditional methods of statutory construction — looking to the statute's text, legislative history and purpose, longstanding interpretations of administrative regulations, and policy considerations — all require the opposite interpretation. I would hold that AS 33.30.028 does not render a prisoner lacking collateral resources enumerated in subsection (a) personally liable for the costs of medical care obtained from outside providers. Accordingly, I respectfully dissent and do not join the plurality opinion.[1]

Alaska Statute 33.30.028 is divided into two subsections. Subsection (a) states that medical care "provided or made available to a prisoner" is "the responsibility of the prisoner and the [five enumerated third-party collateral sources, such as insurers and government welfare agencies]." Subsection (a)'s assignment of liability is made "subject to (b) of this section." Subsection (b) directs the Department of Corrections (DOC) to "require prisoners who are without resources under (a) of this section" to pay for medical care "provided to them by the department" and also goes on to specify a minimum payment "based on the prisoner's ability to pay."[2] This appeal raises the

_____

[1]     Because the court is evenly divided on the issue in this case, the plurality's opinion has the effect of affirming the superior court's ruling but will have no precedential value. *See* Alaska R. App. P. 106(a) ("In an appeal to the supreme court, any issue or point on appeal on which the justices are equally divided is affirmed in that appeal, but the issue or point decided by an equally divided court shall not have precedential effect."); *Barnica v. Kenai Peninsula Borough Sch. Dist.*, 46 P.3d 974, 982 n.1 (Alaska 2002) (Bryner, J., dissenting).

[2]     AS 33.30.028 reads, in relevant part:

(a)     . . . [T]he liability for payment of the costs of medical . . . care provided or made available to a prisoner . . . is, subject to (b) of this section, the responsibility of the

(continued...)

question of whether a prisoner who has received medical care outside of the DOC system but does not have access to one of the enumerated collateral sources listed in subsection (a) is rendered personally liable for the cost of the outside medical services under AS 33.30.028.

In my view, the best reading of this statute is that subsection (a) creates personal liability for all types of health care — both that provided in-house by DOC staff and contractors and that made available by outside medical providers — when the prisoner has a collateral source enumerated in subsection (a).  But when a prisoner has no such collateral source, then subsections (a) and (b), read in conjunction, create personal liability on the part of the prisoner only for health care provided in-house by DOC but not for care rendered by outside health care professionals.

---

[2]     (...continued)
prisoner and the

      (1)     prisoner's insurer if the prisoner is insured . . . ;

      (2)     Department of Health and Social Services if the prisoner is eligible for assistance . . . ;

      (3)     United States Department of Veterans Affairs if the prisoner is eligible for veterans' benefits . . . ;

      (4)     United States Public Health Service, the Indian Health Service, or any affiliated group or agency if the prisoner is a Native American and is entitled to medical care . . . ;

      (5)     parent or guardian of the prisoner if the prisoner is under the age of 18.

(b)     The [DOC] commissioner shall require prisoners who are without resources under (a) of this section to pay the costs of medical . . . care provided to them by the department.  At a minimum, the prisoner shall be required to pay a portion of the costs based upon the prisoner's ability to pay.

The court today takes a different view. It interprets this statute's "plain" and "natural meaning" as making the prisoner personally liable for all types of medical care, both in-house and outside — full stop — and creating third-party liability for those sources enumerated in subsection (a). The court interprets subsection (b) as having no effect whatsoever on subsection (a)'s assignment of liability, concluding instead that subsection (b) is merely a directive to DOC to charge a minimum payment to prisoners without resources enumerated in subsection (a) for care provided in-house by DOC.[3] The court reasons that (1) the statutory language "plain[ly]"[4] compels this "natural reading,"[5] (2) this interpretation is consistent with the statute's "primary purpose . . . to reduce medical costs"[6] and the statute's legislative history indicating "an intent to take advantage of any financial resources to which a prisoner might have access,"[7] and (3) DOC's regulations implementing this statute are not inconsistent with this interpretation.[8] In my view, the court has essentially redrafted the statute, disregarding its plain text, relevant legislative history, and a contrary interpretation by DOC. In doing so, the court has enacted a new policy that will harm the State's fiscal and public safety interests in supporting the successful reentry of prisoners into the community upon their release from incarceration.

---

[3]     Op. at 9-10.

[4]     *Id.* at 9.

[5]     *Id.* at 15.

[6]     *Id.* at 12.

[7]     *Id.*

[8]     *Id.* at 11-12.

The court's interpretation is foreclosed by the text of the statute. Subsection (a) specifically conditions its assignment of liability on subsection (b): "[T]he liability for payment of the costs of medical . . . care provided or made available to a prisoner . . . is, *subject to (b) of this section*, the responsibility of the prisoner and the [enumerated collateral sources] . . . ."[9] The definition of "subject to"[10] and the legislature's deliberate choice to include it in this statute[11] show that subsection (a)'s assignment of liability must be read in conjunction with, and is limited by, subsection (b). If the court were correct, and subsection (a) established a flat assignment of personal liability while subsection (b) merely established an unrelated directive for DOC to charge mandatory minimum fees in certain cases regarding in-house care, then the subject-to clause would serve no purpose, and its deletion would not alter the meaning of the statute at all. But "[w]e must . . . presume 'that the legislature intended every word, sentence, or provision of a statute to have some purpose, force, and effect, and that no words or provisions are superfluous.' "[12]

---

[9]     AS 33.30.028(a) (emphasis added).

[10]     *See* BLACK'S LAW DICTIONARY 1425 (6th ed. 1990) (defining "subject to" as "[l]iable, subordinate, subservient, inferior, obedient to; governed or affected by; provided that; provided; answerable for"); WEBSTER'S NEW INTERNATIONAL DICTIONARY 2509 (2d ed. 1959) ("Being under the contingency of; dependent upon or exposed to (some contingent action); — with *to*." (emphasis in original)).

[11]     The legislature routinely makes one provision in a statute "subject to" another, limiting a party's liability resulting from the first provision by referencing a second provision in such a way as to subtract liability from the first provision. *See, e.g.*, ch. 70, § 14, SLA 1995 (amending the then-current version of AS 33.30.071(a) to declare that "the [State's] responsibility for providing necessary medical services for prisoners remains with the commissioner of corrections . . . subject to the responsibility for payment under AS 33.30.028").

[12]     *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 761 (Alaska 1999) (quoting *Rydwell v. Anchorage Sch. Dist.*, 864 P.2d 526, 530-31 (Alaska 1993)).

The court today "step[s] over the line of interpretation and engag[es] in legislation"[13] by reading out subsection (a)'s subject-to clause from the statute.

I would avoid such judicial redrafting of a legislative enactment by interpreting the statute as written: Subsection (b)'s requirement that DOC recoup some of the costs for in-house care "provided" by DOC for those prisoners without sources enumerated in subsection (a) must limit, by means of the subject-to clause, subsection (a)'s assignment of liability. The only interpretation that preserves all the words of the statute would draw on the distinction between subsection (b)'s use of "provided" and subsection (a)'s use of both "provided" and "made available." This distinction, in conjunction with the subject-to clause, would lead to the conclusion that subsection (a) makes a prisoner personally liable for medical costs provided in-house and for medical costs made available outside of DOC where the prisoner has a collateral source enumerated in subsection (a), but that subsection (a) does not make a prisoner personally liable for medical care rendered by outside healthcare professionals where the prisoner lacks an enumerated source from subsection (a). This interpretation respects the legislature's drafting choices, requires no additions to the statute, and makes no subtractions from the statute. Unfortunately, the same cannot be said of the court's interpretation.

The court responds to my argument by asserting that the subject-to clause is not superfluous because subsection (b) directs DOC to collect payment from prisoners under certain conditions.[14] This assertion simply ignores the meaning of "subject to" in the statutory phrase "subject to (b) of this section." The court would read this text, which

---

[13] *Gottschalk v. State*, 575 P.2d 289, 296 (Alaska 1978) (quoting *Commonwealth v. Armao*, 286 A.2d 626, 632 (Pa. 1972)).

[14] Op. at 9-10.

-22-                                                                6899

plainly limits subsection (a)'s assignment of liability by demanding that it be read in conjunction with a limitation in subsection (b), as merely indicating to the reader: "And subsection (b) also exists, although it has no effect here." The court then claims that "[e]ven if our reading of the statute did render the 'subject to' clause redundant," that redundancy "is closer to the text" than my interpretation.[15] But my interpretation calls for no addition to, subtraction from, or alteration of the text of the statute. All it requires is acknowledging the meaning of "subject to," reading the two clauses in conjunction, and respecting the means employed by the legislature when it chose the text of AS 33.30.028. My interpretation does not create a "substantial negative implication";[16] rather, it follows the explicit statutory directive to read subsection (a) in conjunction with, and as limited by, subsection (b).

The court's interpretation of AS 33.30.028 creates another surplusage problem. Subsection (a) enumerates five collateral sources that are "responsib[le]" for the in-house and outside medical care costs of prisoners. If the court were correct that subsection (a) gives the prisoner responsibility for all costs incurred for all types of medical care, then enumeration of specific collateral sources would be redundant. Even without enumeration, DOC could still invoice those who are already derivatively liable for the prisoner's health care, such as the prisoner's insurer or a public agency providing benefits to the prisoner. The only possible purpose for enumeration of collateral sources in (a) that would not render the enumeration mere surplusage would be to limit, in

---

[15]     *Id.* at 10.

[16]     *Id.*

conjunction with subsection (b) and the subject-to clause of subsection (a), prisoner liability for certain types of care where the prisoner lacks an enumerated source.[17]

The court responds by hypothesizing three purposes for enumerating collateral sources. But none of the court's reasons seem plausible. The court asserts that enumerating sources in subsection (a) "gives notice to potential collateral payers,"[18] but it could hardly be news to an insurer that it is liable for medical costs covered by its contract with the insured.[19] It could hardly be news to a government agency that it would provide benefits for people who meet the qualifications for benefits.[20] And it could hardly be news to parents and guardians that they may be liable for the medical care of their minor children.[21] The court also asserts that enumeration "provides prisoners with

---

[17]    Enumeration of sources in subsection (a) does not, on its own, *create* third-party liability on the part of anyone. In order to have the third-party deemed "responsib[le]" by AS 33.30.028(a), the prisoner must already be eligible for benefits from a public agency or have an insurance plan that covers such costs. Indeed, the state legislature simply would not have the power to make a federal agency like the United States Department of Veterans Affairs "responsib[le]" for a prisoner's medical costs unless federal law already provided for such responsibility. Accordingly, the court may not rely on the creation of third-party liability as a non-surplusage purpose for the enumeration in subsection (a).

[18]    Op. at 10.

[19]    *See* AS 33.30.028(a)(1) (making certain types of medical care the "responsibility" of the "prisoner's insurer if the prisoner is insured").

[20]    *See* AS 33.30.028(a)(2)-(4) (making certain types of medical care the "responsibility" of the Department of Health and Social Services and the United States Department of Veterans Affairs, "if the prisoner is eligible," and the United States Public Health Service or the Indian Health Service, "if the prisoner is a Native American and is entitled to medical care from those agencies or groups").

[21]    *See* AS 33.30.028(a)(5) (making certain types of medical care the
(continued...)

guidance about their payment and coverage options,"[22] but the Alaska Statutes provide rules of law and are generally not thought of as means for providing non-binding financial advice to prisoners. And the court asserts that enumeration "provides the DOC with a list of alternative payers to collect from,"[23] but DOC could collect from anyone already liable for a prisoner's health care even without enumeration. Under the court's theory, the statute's legal effect would thus not be altered one iota by omitting enumeration, and the court does not resolve this surplusage problem. Moreover, there is no indication whatsoever in the legislative history that the legislature had any such non-legal reasons for enumerating collateral sources.

In sum, the court's opinion effectively deletes statutory text by omitting it from its main conclusion that subsection (a) assigns personal liability for all medical costs to the prisoner. The court's conclusion ignores the subject-to clause from the statute as well as the enumeration of collateral sources. Only by eliminating critical language in the statutory provision can the court read it to create the unconditional assignment of personal liability for all medical care that the court finds in AS 33.30.028 today.

The court's interpretation is also contradicted by the statute's purpose. It is clear from the legislative history of AS 33.30.028 that the legislature intended for this statute to deter frivolous prisoner medical complaints and the overuse of medical services.[24] It is also clear that this deterrence rationale outweighed any subsidiary goal

---

[21]     (...continued)
"responsibility" of the "parent or guardian of the prisoner if the prisoner is under the age of 18").

[22]     Op. at 10.

[23]     *Id*.

[24]     Staffer Dennis DeWitt testified to the House Finance Committee that the
(continued...)

of recovering costs.[25]  (Indeed, almost all of the cost-savings discussion in the legislative history revolved around an entirely *different* statute that was part of the same bill and would make certain terminally ill prisoners eligible for special medical parole in order to remove from the public the burden of paying for their health care costs.)

That the statute's primary purpose is to deter overuse of medical resources supports the plain-text interpretation that subsection (a) assigns personal liability to the prisoner for all in-house care, but assigns personal liability only for outside care where

---

[24]    (...continued)
statute is "designed to act as a deterrent to frivolous complaints."  Similarly, DeWitt told the Senate Judiciary Committee that the statute "allows the Department of Corrections to establish a billing mechanism for medical services within prisons to help control medical services, similar to a deductible in a traditional health insurance policy."  Assistant Attorney General Michael Stark informed the House Finance Committee that "the legislation will deter frivolous medical complaints" and that the harm the legislation was designed to prevent stemmed from the fact that "institutionalized populations often include individuals that manifest medical complaints in which there is no basis in fact."  Representative Eldon Mulder told the House committee that "[t]he whole thing is to make certain there is a need for a doctor so they know it costs to see a doctor."  Minutes, H. Judiciary Comm. Hearing on H.B. 219, 19th Leg., 1st Sess. (Mar. 24, 1995).

[25]    DeWitt testified to the House committee that "the co-payments would be small" because the statute "is an attempt to allow the Department to get control on utilization as opposed to securing revenue."  Representative Mulder stated to the committee that "[t]his is one of those areas where they are trying to do *a little bit* of cost prevention" (emphasis added) while DOC Special Assistant Jerry Shriner "stressed that collection would be difficult and the cost of collecting could exceed the amount collected."  Representative Con Bunde "stated he wouldn't look at it to really recapture much money, and the net result might be by the time the paperwork is done, there is no money return."  Representative Bunde went on to state that "that's simply a token payment so that they're reminded of their cooperation in their rehabilitation or whatever. . . . [I]t's not going to make any money necessarily for the Department of Corrections. . . . I just want to make sure that we understand we're not making a fiscal impact while we do this."  When the bill was passed out of committee, it received "zero fiscal notes" indicating that it was not expected to impact the budget.  *Id.*

a prisoner has a collateral source enumerated in (a). Prisoners are free to seek *in-house* medical services on their own volition, thus making copayment through personal liability a useful deterrent to frivolous medical complaints. But personal liability for a copayment for treatment by *outside* staff would not serve the goal of deterring frivolous overuse of medical services because prisoners receive outside medical treatment only upon referral from in-house prison staff.[26] Simply put, with DOC medical staff standing as gatekeepers, there is no frivolous overuse of outside medical resources that would be deterred by personal liability for copayments.[27] Thus, the statute's purpose is furthered by the text the legislature used to enact it; the court's interpretation of that text today does not further the legislature's goal.

---

[26] DOC's brief states that the rationale "to provide . . . a disincentive to making frivolous requests for care . . . does not apply to care received from outside providers because outside specialist referrals are made only at the direction of the DOC medical staff." *See also* DOC Policy & Procedure 807.02 IV.D.4 ("The Department may use consultants and specialists as needed to provide health care services to prisoners as outpatients or through hospitalization. The health care practitioner, in coordination with the Superintendent, shall initiate referrals for special services and routine consultations services. The Medical Director must approve all non-emergency referrals.").

[27] The court asserts, without any explanation, that the requirement that prisoners obtain DOC approval before seeking or obtaining outside care will not deter frivolous overuse of outside medical care; it then concludes that the goal of deterring frivolous overuse of outside medical care will instead be served by assigning personal liability for such care when prisoners lack enumerated collateral sources. Op. at 13-14. But it is unclear how medically necessary outside care, pre-approved by DOC, could ever be frivolous. The behavior that the court claims must be deterred is simply nonexistent, by definition. The court's claim that its "reading of the statute is better suited to achieving . . . deterrence" of frivolous overuse of outside medical care, is thus utterly unsupported. *Id.* at 13.

Despite this clear legislative history, the court concludes that "the primary purpose of this statute is to reduce medical costs."[28] The court reaches this conclusion by quoting dicta from one of our prior cases interpreting AS 33.30.028 in which we held that the statute applied to former prisoners as well as current prisoners.[29] In that case, we stated: "Although the legislative history does not explicitly address extending liability to former prisoners, preventing the State from collecting from prisoners to the fullest extent possible would contravene the statute's cost-saving purpose."[30] Citing only this very general statement of legislative intent from a case addressing a distinct issue, today's court concludes that including a "prisoner's personal wealth among those resources subject to reimbursement is consistent with the statute's primary purpose of reducing the DOC's medical costs."[31]

The court is incorrect in its conclusion that the primary purpose of the statute is to reduce DOC's medical costs through cost recovery. The court mistakenly relies on dicta regarding legislative intent in our prior decision interpreting AS 33.30.028. In that case, we addressed an issue for which there was no need to go beyond a conclusion that the purpose of the statute, stated at the highest level of generality, was cost savings. But reducing frivolous use of DOC medical services is a measure that saves costs. We had no reason to detail these more specific cost-saving goals, such as deterring over-use of in-house medical services, because examining legislative purpose at a high level of generality sufficed to answer the question presented. Accordingly, we did not purport to

---

[28]     *Id.* at 12.

[29]     *State, Dep't of Corr. v. Hendricks-Pearce*, 254 P.3d 1088, 1092-93 (Alaska 2011).

[30]     *Id.* at 1093.

[31]     Op. at 12.

give the final word on the purpose of AS 33.30.028. By contrast, this case raises the question of the more specific purpose of the statute; one proffered purpose — raising revenue — favors one interpretation while another proffered purpose — deterrence of frivolous use of medical services — favors a different interpretation. As discussed above, the legislative history clearly indicates that deterrence of frivolous overuse was the primary purpose of AS 33.30.028.

The court today deletes from the statute the subject-to clause and the enumeration of collateral sources in subsection (a), and then reaches its conclusion by relying on an abstract statement of legislative purpose unsupported by the legislative history or the legislative text. Properly used, legislative intent can clarify statutory text, but the intent must be discerned carefully and should never supplant the plain meaning of unambiguous text.

The court relies on a single statement in the legislative history to support its conclusion that the legislature intended for AS 33.30.028(a) to establish personal liability for outside medical care. Its reliance is misplaced. The court quotes a staffer testifying in the House Finance Committee that the legislation was intended to reach "individuals . . . that will have other coverage *or resources*," including "*the resources of someone that is independently wealthy*."[32] The court concludes from these pieces of evidence that "the committee intended that a prisoner's personal wealth be included within the coverage of this statute."[33] The legislative history certainly does suggest that the legislature sought to make prisoners personally liable for at least some expenses. For that matter, so does the legislative text of subsection (a). Thus, appeals to legislative history on this point are unnecessary. But this general statement of intent is simply irrelevant in this case. My

---

[32]     *Id.* at 12-13 (emphasis and omission from opinion).

[33]     *Id.* at 13.

interpretation of AS 33.30.028 would assign personal liability for at least some medical costs. The more specific question before the court today is whether AS 33.30.028 assigns personal liability in only those cases where a prisoner received in-house care and where the prisoner received outside care and also has enumerated collateral resources, or whether the statute also assigns personal liability in those cases where the prisoner received outside care and lacks enumerated collateral resources. In the end, the court points to absolutely no support for its reconstruction of the abstract purpose animating this statute, nor does it respond to or refute the voluminous contrary legislative history.

The court's interpretation is also inconsistent with the longstanding interpretation of the statute by DOC's own regulations. In 22 Alaska Administrative Code (AAC) 05.121, DOC implemented the authority granted by the legislature in AS 33.30.028. The regulations specify in subsection (b)(1) that "a prisoner is financially responsible for a co-payment for health care services provided to the prisoner by the department through department employees or designated contractors"[34] while subsection (b)(2) specifies that "a prisoner shall arrange for the department to obtain payment or coverage from one or more of the responsible parties set out in AS 33.30.028(a), if the prisoner receives health care services not provided through department employees or designated contractors."[35]

These regulations interpret AS 33.30.028 in accord with my interpretation of the statute and contrary to the court's conclusion today. Subsection (b)(1) makes the prisoner personally "financially responsible" for costs incurred in-house, while subsection (b)(2) conspicuously omits any declaration of personal financial responsibility for outside medical care and instead directs the prisoner to "arrange for . . . payment . . .

---

[34]     22 AAC 05.121(b)(1).

[35]     22 AAC 05.121(b)(2).

from one or more of the responsible parties set out in AS 33.30.028(a)." The most natural reading of this language is that the prisoner is not personally financially responsible for outside medical care when he lacks enumerated collateral sources. The court concludes that "the regulation does not conflict with [its] reading of the statute,"[36] which assumes that a prisoner is ultimately liable for the entire cost of all medical services received by the prisoner. But the court never addresses the conspicuous lack of assignment of personal financial responsibility in subsection (b)(2) of the regulation or the indirect phrasing of "arrange for." If the fact that a prisoner is potentially a "responsible party set out in AS 33.30.028" made the prisoner personally responsible for payment for outside care even without collateral sources, it would be an odd turn of phrase indeed to assign personal liability to a prisoner by directing the prisoner to "arrange for . . . payment" from himself, particularly when DOC in the immediately prior subsection of the regulation has already demonstrated that it knows how to assign personal liability directly.

In my view, the language and legislative history of AS 33.30.028 are sufficiently clear that I would hold for Hendricks-Pearce on their strength alone. But even if the statute's meaning were ambiguous in this case, DOC's longstanding interpretation

---

[36]    Op. at 11.

of AS 33.30.028 should resolve any lingering ambiguity.[37]  (That DOC has adopted a contrary interpretation of the statute during this litigation is of no moment.[38])

The court dismisses the import of DOC's interpretation by invoking two mutually contradictory reasons.  First, the court indicates that the "plain" text and "natural reading"suffice to reach its preferred interpretation, implying that there is no lingering ambiguity in the statutory text for the regulations to resolve.  As I discuss above, the best reading of the statute's text and purpose clearly favors my interpretation, but, at the very least, the statute is ambiguous, and the court must address DOC's contrary interpretation.  Second, without acknowledging the contradiction with the first reason, the court states that the statute is "silen[t]" on the assignment of personal liability for the cost of outside medical care where a prisoner lacks enumerated collateral resources.[39]  The court then concludes that DOC's interpretation of the statute "properly goes no further" than the statute and "says nothing of divesting the prisoner lacking collateral resources of liability

---

[37]      *See Marathon Oil Co. v. State, Dep't of Natural Res.*, 254 P.3d 1078, 1082 (Alaska 2011) (defining the "reasonable basis standard . . . under which we give deference to the agency's interpretation so long as it is reasonable, when the interpretation at issue implicates agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions"); *State, Alaska Bd. of Fisheries v. Grunert*, 139 P.3d 1226, 1232 (Alaska 2006) (stating that "we consider whether the regulation is reasonable and not arbitrary.  Where highly specialized agency expertise is involved, we will not substitute our own judgment for the board's.  Our role is to ensure only that the agency has taken a hard look at the salient problems.").

How and when to bill prisoners for medical expenses in order to deter frivolous overuse of medical services is clearly a question subject to DOC's agency expertise as established in its regulations.

[38]      *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

[39]      Op. at 11.

for outside services."[40]  Not only is this argument as to statutory silence contradicted by the court's own argument about the plain meaning of the statutory text, it also contradicts itself: why would an interpretive regulation have to divest a prisoner of liability that is never assigned by the statute?

Finally, the court's interpretation of the statute creates a damaging policy that will undermine the State's fiscal and public safety interest in reducing recidivism and supporting prisoners' successful reentry into the community after release.  When deciding questions of law, such as interpreting the meaning of a statute, we have repeatedly stated that "[o]ur duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[41]  I would interpret AS 33.30.028 based on text, purpose, and administrative interpretation so that the statute enacts a reasonable policy:  Prisoners will be deterred from frivolous over-consumption of medical services — both in-house and rendered outside the DOC system — while DOC will be able to recover costs when a prisoner has access to an enumerated source of coverage or benefits.

As the court interprets AS 33.30.028 today, the statute would inflict significant harms to the State's interests and to the individual liberty of former prisoners who have completed their sentences.  When a prisoner receives substantial medical care that is uncompensated by collateral sources, DOC will be in the position of superintending the person's ability to save any money at all, starting while the person is in prison and extending indefinitely after release.  If a former prisoner is lucky enough to reintegrate successfully and obtain a modicum of savings to secure a stable life, DOC will be able to seek reimbursement under AS 33.30.028 years after release.  In effect, DOC

---

[40]  *Id.*

[41]  *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979); *see, e.g.*, *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 72-73 (Alaska 2013).

will have the power to prevent any former prisoner who received unreimbursed care from achieving more than a subsistence existence until the unreimbursed cost of care is paid back. The logic of this claimed power would also seem to permit the State to withhold virtually any form of government assistance, including Permanent Fund Dividend payments, government salary disbursements, unemployment benefits, payments provided under contract, and welfare payments. It would also seem to permit the State to seek repayment by forcing former prisoners to liquidate their meager assets or borrow against future earnings from licenses or other non-tangible assets or unrealized gains.

I would conclude that the statute's text, purpose, and administrative interpretation foreclose this result. The statutory text and legislative history make clear that the legislators thought they were passing a bill with only minimal charges for prisoners that would have the deterrent effect of a copayment for a subset of medical services.[42]

The court's policy choice will harm the State's interests in reducing ex-offender recidivism, protecting public safety, and safeguarding the public fisc. Personal financial resources are a crucial determinant of successful prison reentry and recidivism prevention.[43] Reducing recidivism protects public safety by preventing future crime, and

---

[42]    The legislative history is discussed more fully above. *See supra* notes 24-25. But the legislators' view that this bill would have only a limited reach bears reiterating here. The bill's sponsor, Representative Mulder, described the statute to the House Finance Committee as "adding a small cha[r]ge to inmates for medical care, as a way for Corrections to let inmates know that there is a cost for prescription drugs and medical relief." Assistant Attorney General Stark "emphasized that the provision is not intended as part of the punishment imposed on an inmate" but rather "that the legislation will deter frivolous medical complaints." Minutes, H. Judiciary Comm. Hearing on H.B. 219, 19th Leg., 1st Sess. (Mar. 24, 1995).

[43]    *See generally* ALASKA PRISONER REENTRY TASK FORCE, FIVE-YEAR
(continued...)

it also reduces State spending on investigation, prosecution, defense, and punishment stemming from the commission of future crimes.[44] It was thus reasonable for the legislature to adopt statutory text with the effect of limiting personal liability for outside healthcare expenditures. The court's reconstruction of AS 33.30.028 institutes a new policy, one that harms these important State goals.

For these reasons, I would hold that AS 33.30.028 does not impose personal liability on prisoners for the cost of health care rendered by professionals outside of the DOC system where the person lacks a collateral source enumerated in AS 33.30.028(a). I would reverse the superior court and remand. I therefore respectfully dissent and do not join the plurality opinion.

---

[43] (...continued)
PRISONER REENTRY STRATEGIC PLAN, 2011-2016, at 26 (2011), *available at* http://www.correct.state.ak.us/TskForce/documents/Five-Year%20Prisoner%20Reentry%20Plan.pdf (identifying "[l]ow levels of . . . vocational and financial achievement" as "criminogenic needs" leading to recidivism and reincarceration); *id.* at 65 ("[O]ne of the greatest contributing factors to recidivism was indigence . . . .").

The State understands the importance of successful prisoner reentry and the crucial role of personal income in reentry policy. Accordingly, DOC encourages all persons leaving prison to create "reentry plans" that include steps for earning income and accumulating personal savings. ALASKA DEPARTMENT OF CORRECTIONS, REENTRY MANUAL 24-25, 32-33 (2012), *available at* http://www.correct.state.ak.us/TskForce/documents/Re%20Entry%20All%20edited%20pg%2040.pdf.

[44] *See generally* ALASKA STRATEGIC PLAN, *supra* note 43, at 4-5, 21-22.